**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

|  |  |  |
|---|---|---|
| AUGUSTINE F. FORKWAR, | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 11-cv-03482-AW |
| | * | |
| PROGRESSIVE NORTHERN | * | |
| INSURANCE COMPANY, INC. *et al.*, | * | |
| Defendants. | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

<u>**MEMORANDUM OPINION**</u>

Pending before the Court are Defendants' Motion for Summary Judgment, Doc. No. 9, and Plaintiff's Motion to Stay, Doc. No. 12.  The Court has reviewed the motion papers and concludes that no hearing is necessary.  *See* Loc. R. 105.6 (D. Md. 2011).  For the reasons discussed below, the Court will DENY Plaintiff's Motion to Stay and GRANT Defendants' Motion for Summary Judgment.[1]

## I.      FACTUAL AND PROCEDURAL HISTORY

The following undisputed facts are taken from the Complaint, motion papers and attached exhibits.  This case arises from an automobile accident on November 26, 2004, in which Plaintiff Augustine Forkwar was severely injured when his vehicle collided with a truck driven by Hameed Mahdi.  Mahdi's vehicle was a 1987 Kenworth tractor which, at the time of the accident, Mahdi was driving without a trailer.  Analysis of this case requires extensive discussion of the relevant policy provisions as well as prior state and federal court litigation that addressed issues relating to the November 26, 2004 accident.

---

[1] Also pending is Plaintiff's Motion for Extension of Time to File a Response to Defendants' Motion for Summary Judgment.  Doc. No. 13.  Because Plaintiff timely filed a response to Defendants' Motion for Summary Judgment, Plaintiff's Motion for Extension will be DENIED as moot.

A.      The Progressive Northern Policy and MCS-90 Endorsement

At the time of the accident, J & J Logistics, Inc. was covered under a policy of commercial auto insurance (hereinafter, the Policy) by Defendant Progressive Northern Insurance Company (hereinafter Progressive Northern).  J & J Logistics was the sole named insured under the Policy.  Mahdi was not listed as a rated driver under the Policy, and Mahdi's 1987 Kenworth tractor was not included among the Policy's covered vehicles.  Doc. No. 9 Ex. B, at PL60–62.  Furthermore, the Policy's definitions of "insured" and "insured auto" provided that neither Mahdi nor his tractor were covered by the Policy.  *Id.* at PL87–89.  The Policy also contained a federally mandated MCS-90 endorsement.  *Id.* at PL81.  This case largely depends on interpretation of the MCS-90 endorsement, discussed *infra* Part III.B.2.

B.      The Prior State Court Action

On August 27, 2007, Plaintiff filed suit against Mahdi, J & J Logistics, and Forkwar's uninsured and undersinsured motorist coverage provider, New Hampshire Insurance Company (hereinafter New Hampshire Insurance), in the Circuit Court for Prince George's County, Maryland.  The case was styled *Augustine F. Forkwar v. J & J Logistics, et al.*, Case No. CAL06-23064 (referred to hereinafter as "the state court action").

 The state court action proceeded to trial against all defendants on December 3, 2008. J & J Logistics was sued under theories of vicarious liability as the putative employer of Mahdi. During trial, Forkwar's attorney called Marcus Johnson, owner of J & J Logistics, as a witness, and elicited the following testimony:

> Q:      [By Michael Blumenthal, attorney for Augustine Forkwar] Mr. Johnson, by whom are you employed, sir?
> A:      J & J Logistics.
> …
> Q:      Was J & J Logistics in existence in November, 2004?
> A:      Yes, it was.

Q:      Were you president of J & J Logistics in November 2004?

A:      Yes, I was.

Q:      Do you keep the records, is that your job, to make sure the records are kept in the ordinary course of business and are clear and true and all that stuff?

A:      Yes.

Q:      So you are the custodian of those records?

A:      Yes.

Q:      You do know Hameed Mahdi, is that correct?

A:      Yes, I do.

Q:      Can you tell the jury what relationship if any Hameed Mahdi had at any time with J & J Logistics, Incorporated?

A:      Well, Hameed Mahdi, he's an independent contractor.  He had his own truck and he worked for J & J occasionally in the past.

…

Q:      Was Mr. Mahdi an independent contractor for J & J Logistics in November 2004?

A:      No.

Q:      Did he have any ongoing business relationship with J & J Logistics in November 2004?

A:      Not as I can recollect.

Q:      You are aware that in November 2004 Mr. Mahdi got into a collision with a vehicle being operated by Augustine Forkwar, the plaintiff in this matter, correct?

A:      Yes.

Q:      While Mr. Mahdi was operating the vehicle involved in this collision, was Mr. Mahdi at the time of the collision under dispatch by J & J Logistics, Inc.?

A:      No.

Q:      Was Mr. Mahdi in any way acting within the scope of and in furtherance of the interest of J & J Logistics, Inc. at the time of that collision with Mr. Forkwar on November 26, 2004?

A:      No.

Q:      Mr. Mahdi has indicated to someone at J & J Logistics that at the time of the collision he was driving to a shop to get to or otherwise tend to some tires that he had to deal with, is that correct?

A:      It's been a long time.  I would imagine it could have been.

…

Q:      You did answer the interrogatories, correct?  I'm going to offer these to you to see if I could refresh your recollection.  Could you read to yourself the answer to Interrogatory No. 11?

…

Q:      Sir, having reviewed that document, does it refresh your recollection as to whether or not there was a point in time that Mr. Mahdi indicated to someone at J & J Logistics that at the time of the collision he was doing something to attend to his tires on his vehicle.

A:      It could have been, you know, I have two other people in my office besides me that he could have, you know.

3

Q:      And your answer was he told J & J Logistics he was driving to a shop to get tires or attend to tires at the time of the collision, correct?

A:      It could be correct, yes.

Q:      Who owned the truck that Mr. Mahdi was operating on November 2[6], 2004?

A:      He owned the truck.  He was an independent contractor.

Q:      And the tru[c]k had J & J Logistics written on it, is that right?

A:      No.  The truck might would have had a sticker or something on it.  We used stickers and stuff to put on the truck with our name and our MC number.

Q:      But that doesn't change the understanding between you and Mr. Mahdi with regard to his relationship with you, correct?

A:      Well, I don't understand what you're saying.

Q:      I mean the fact that his truck said J & J Logistics, Inc. on it on a sticker doesn't change the contractual relationship with Mr. Mahdi that established that he was an independent contractor acting on his own behalf, he is not under a dispatch is not otherwise acting on your behalf, you being J & J Logistics?

A:      That's true.

Q:      [Mr. Blumenthal] I have no other questions, Your Honor.

Doc. No. 9 Ex. A, at 1–4.  Following this testimony, J & J Logistics moved for judgment as to

Forkwar's claims against it.  In response, Mr. Blumenthal stated the following:

I can tell the Court that there would be nothing in addition from Mr. Forkwar with regard to that issue, and of course that -- -- the other evidence with regard to negligence and with regard to Mr. Mahdi, but with regard to the question whether Mr. Mahdi was acting on his own behalf for his own purposes or for purposes of J & J Logistics, that's the extent of our evidence.  And if Your Honor would let me close as to that part of the case, I would do so with the intention of offering additional evidence otherwise.

*Id.* at 5.  After Circuit Court Judge Mittelstaedt dismissed the jury from the courtroom, the

following exchange occurred with counsel:

MR. BLUMENTHAL: Your Honor, I would close.  I have nothing further against J & J Logistics.  I don't think it's fair to keep [counsel for J & J Logistics] Mr. Wampler and his client in here at this point, given the state of the evidence, particularly since Mr. Mahdi didn't show up and we hoped he would.  I can close at this time. I would intend to reopen as to the negligence of Mr. Mahdi.

…

THE COURT: All right.  Under Count 2, respondeat superior claim against J & J Logistics, Incorporated, the Court finds that the plaintiff has failed to establish a prima facie case of agency against J & J Logistics and that they failed to show that Mr. Mahdi was operating the vehicle on behalf of J & J Logistics or in the

furtherance of J & J Logistics' business.  So therefore judgment is granted in
favor of J & J Logistics, Inc. as to Count 2.

*Id.* at 5–7.  Blumenthal thereafter filed a Line of Dismissal without prejudice of his remaining

counts against New Hampshire Insurance, leaving Mahdi as the only defendant in the case.  *Id.* at

7.  The jury thereafter returned a verdict in favor of Mahdi in the amount of $180,756.76.  *Id.*

      C.     The Prior Federal Court Action

In an attempt to collect his state court judgment, Forkwar brought an action against

Mahdi's insurer, Empire Fire & Marine Insurance Company (Empire), in the Circuit Court of

Prince George's County on April 14, 2009.  The case was removed to the District Court of

Maryland on June 11, 2009, *see Forkwar v. Empire Fire & Marine Insurance Company*, Case

No. 8:09-cv-01543-WGC, and will hereinafter be referred to as the prior federal court action or

the Empire litigation.

In the course of the Empire litigation, it was revealed that Mahdi had executed an

Independent Contractor Agreement with J & J Logistics which was in effect at the time of the

accident.  *See* Doc. No. 14 Ex. 3.  Mahdi also provided a sworn statement that as of November

2004, he was working for J & J Logistics about three days a week.  *Id.* Ex. 4, at 6.  Mahdi stated

that on November 25, 2004, he called the dispatcher for J & J Logistics and was told to pick up a

load at a Giant food warehouse.  *Id.* at 8–9.  Mahdi further stated that the accident occurred when

he was on his way to the warehouse to pick up the load for J & J Logistics.  *Id.* at 15–17.

It was also revealed during the Empire litigation that Forkwar's attorney in the state court

action had been advised prior to the state court trial as to Mahdi's employment situation and the

circumstances surrounding the accident.  Claims specialists with Empire sent Mr. Blumenthal

two letters, dated January 18, 2005 and April 13, 2006, informing him that the Empire policy

would not provide coverage because Mahdi was under dispatch by J & J Logistics at the time of

the accident. *Forkwar v. Empire Fire & Marine Ins. Co.*, No. 09-cv-01543-WGC, 2010 WL

3733930, at *1–3 (D. Md. Sept. 20, 2010).

The district court held that Empire was entitled to judgment as a matter of law under the

"Business Use exclusion" of Mahdi's policy with Empire:

> Mr. Mahdi was neither "pursuing leisurely engagement" nor "engaged in some
> frolic and detour, heading somewhere for his own purpose and no other" when his
> truck collided with Mr. Forkwar's vehicle. Mr. Mahdi had received instructions
> from J & J Logistics to pick up a load at the Giant warehouse. Although Mr.
> Mahdi had decided to stop for a meal before reporting to the Giant warehouse, the
> only reason why Mr. Mahdi was operating his vehicle at the time of the accident
> was in furtherance of J & J Logistics' business.

*Forkwar*, 2010 WL 3733930, at *20. The district court also rejected Forkwar's argument that

collateral estoppel barred Empire from arguing that Mahdi was using the truck for a business

purpose. *Id.* at *12–17.

The Fourth Circuit affirmed the district court's decision in its entirety. *See Forkwar v.*

*Empire Fire & Marine Ins. Co.*, No. 20-2160, 2012 WL 2402564 (4th Cir. June 27, 2012) (not

selected for publication). The court provided the following factual background:

> At trial [in the state court action], Forkwar made no effort to affirmatively
> demonstrate that J & J was liable. In his opening statement, Forkwar's attorney
> told the jury that the judge "will take care of J & J, and I expect that they will be
> walking out of the courtroom." He said he would "attempt to show ironically that
> J & J didn't have anything to do with Mr. Mahdi." And when J & J made a mid-
> trial motion for judgment as a matter of law, Forkwar did not oppose the motion.
> Mahdi also failed to show up to the trial.

*Id.* at *1. The court noted that "[w]hile [Forkwar] never explains his strategy, it appears he

brought suit against J & J solely to have a verdict entered in J & J's favor on the respondeat

superior claim, which he believes collaterally estops Empire from asserting the business use

exception. For the reasons given below, we disagree." *Id.* at *1 n.1. On the collateral estoppel

issue, the Fourth Circuit held:

6

> Plainly, the *respondeat superior* doctrine and the business use exception are not identical issues. While *respondeat superior* requires the existence of an employer-employee relationship, the business use exception has no such element. Thus, an individual like Forkwar who was acting "in the business of" J & J but who is an independent contractor rather than employee would be subject to the [Empire] Policy's exclusion without falling under the doctrine of *respondeat superior.*

*Id.* at \*3.

      D.     <u>The Instant Litigation</u>

On October 1, 2012, Defendants filed their pending Motion for Summary Judgment. Doc. No. 9.  Defendants contend that Progressive Northern is entitled to summary judgment on the grounds of res judicata and interpretation of the relevant Policy provisions and MCS-90 endorsement.  Defendants also contend Progressive Classic Insurance Company (Progressive Classic) is entitled to judgment as a matter of law on the sole basis that it was not providing any coverage to J & J Logistics on the date of the accident, and it did not issue any policy to J & J Logistics until June 24, 2005.  *Id.* at 6 n.1, Ex. C.  Plaintiff does not dispute Defendants' contention with respect to Progressive Classic.  Plaintiff filed a Motion to Stay these proceedings on October 29, 2012 on the grounds that he intends to file a motion to vacate or revise the state court judgment.  Doc. No. 12.  Both Motions have been fully briefed and are ripe for the Court's consideration.

## II.    MOTION TO STAY

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants."  *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).  "How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance."  *Id.* at 254–55.

Plaintiff argues that the Court should stay this case pending the outcome of a motion to revise and vacate the Maryland Circuit Court's judgment in favor of J & J Logistics. Plaintiff states that "[b]ased on information that was learned after the state court judgment, it is Forkwar's position that J & J Logistics obtained its judgment by fraud." Doc. No. 12 at 2. The record indicates that such a motion has yet to be filed,[2] and Plaintiff makes no representations as to the anticipated length of its requested stay. Furthermore, Plaintiff has failed to articulate the specific grounds underlying its allegations of fraud. The Court believes, however, that even if Plaintiff files such a motion, he is unlikely to succeed in vacating or revising the state court's judgment.

Under Maryland Rule 2-535(b), a Circuit Court "may exercise revisory power and control over the judgment in case of fraud, mistake, or irregularity." As explained by the Court of Appeals of Maryland, the showing of fraud in this context must establish "extrinsic" rather than "intrinsic" fraud:

> [It is] settled beyond question that an enrolled decree will not be vacated even though obtained by the use of forged documents, perjured testimony, or any other frauds which are "intrinsic" to the trial of the case itself. Underlying this long settled rule is the principle that, once parties have had the opportunity to present before a court a matter for investigation and determination, and once the decision has been rendered and the litigants, if they so choose, have exhausted every means of reviewing it, the public policy of this State demands that there be an end to that litigation.

*Schwartz v. Merchants Mortg. Co.*, 322 A.2d 544, 546 (Md. 1974). The Court of Special Appeals has explained that "fraud is extrinsic when it actually prevents an adversarial trial but it is intrinsic when it is employed during the course of a hearing which provides the forum for the truth to appear, albeit, that trust was distorted by the complained of fraud." *Manigan v. Burson*, 862 A.2d 1037, 1041 (Md. Ct. Spec. App. 2004) (quoting *Billingsley v. Lawson*, 406 A.2d 946,

---

[2] Defendants stated in their Response to Plaintiff's Motion to Stay that as of November 13, 2012, no such motion had been docketed. *See* Doc. No. 15 at 8. Plaintiff did not timely file a reply brief, and the Court therefore has no evidence that Plaintiff has filed a motion with the Circuit Court of Prince George's County.

951 (Md. Ct. Spec. App. 1979)).  The Court of Appeals in *Schwartz* set forth the following examples of "extrinsic" fraud:

> Where the unsuccessful party has been prevented from exhibiting fully his case, by fraud or deception practiced on him by his opponent, as by keeping him away from court, a false promise of a compromise; or where the defendant never had knowledge of the suit, being kept in ignorance by the acts of the plaintiff; or where an attorney fraudulently or without authority assumes to represent a party and connives at his defeat; or where the attorney regularly employed corruptly sells out his client's interest to the other side . . . .

*Schwartz*, 322 A.2d at 547 (quoting *United States v. Throckmorton*, 98 U.S. 61, 95 (1878)).

Plaintiff has not articulated any basis for extrinsic fraud in the state court action.  Any claim that J & J Logistics' owner, Marcus Johnson, perjured himself by stating that Mahdi had no relationship with J & J Logistics at the time of the accident would be intrinsic fraud. Moreover, despite Plaintiff's representations that he learned of Mahdi's employment situation *after* entry of the state court judgment, the record shows that Plaintiff's attorney was aware prior to the state court trial of Empire's position that Mahdi was under dispatch by J & J Logistics at the time of the accident.  *Forkwar*, 2010 WL 3733930, at *1–3.  As noted by the Fourth Circuit in the Empire litigation, it appears that Plaintiff's attorney made a strategic judgment not to pursue a judgment against J & J Logistics in the state court action.  *Forkwar*, 2012 WL 2402564, at *1 n.1.  It is therefore highly unlikely that Plaintiff will succeed in vacating the Circuit Court's judgment in favor of J & J Logistics, and Plaintiff has provided no other basis in support of its Motion to Stay.  Accordingly, the Court will deny Plaintiff's Motion.

## III.    MOTION FOR SUMMARY JUDGMENT

### A.    Standard of Review

Summary judgment is only appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also*

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986).  The Court must "draw all justifiable

inferences in favor of the nonmoving party, including questions of credibility and of the weight

to be accorded to particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520

(1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  In ruling on a motion

for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the

drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ."

*Okoli v. City of Balt.*, 648 F.3d 216, 231 (4th Cir. 2011) (quoting *Anderson*, 477 U.S. at 255).

        To defeat a motion for summary judgment, the nonmoving party must come forward with

affidavits or other similar evidence to show that a genuine issue of material fact exists.  *See*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  A disputed fact

presents a genuine issue "if, after reviewing the record as a whole . . . a reasonable jury could

return a verdict for [the non-moving party]." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d

954, 959 (4th Cir. 1996) (citing *Anderson*, 477 U.S. at 248).  Although the Court should believe

the evidence of the nonmoving party and draw all justifiable inferences in his favor, a

nonmoving party cannot create a genuine dispute of material fact "through mere speculation or

the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

        B.       Analysis

        The Court must apply Maryland law of res judicata to determine the preclusive effect of

the state court's judgment.  *In re Genesys Data Techs., Inc.*, 204 F.3d 124, 129 (4th Cir. 2000).

The doctrine of res judicata provides that "a judgment in an earlier case bars all matters which

were and *could have been* litigated in the earlier case from being re-litigated in a later case."

*Jones v. Fisher Law Group, PLLC*, 334 F. Supp. 2d 847, 851 (D. Md. 2004) (citing *MPC. Inc. v.*

*Kenny*, 367 A.2d 486, 488–89 (Md. 1977)) (emphasis in original).  Under Maryland law, the doctrine bars relitigation of a claim "if there is a final judgment in a previous litigation where the parties, the subject matter and causes of action are identical or substantially identical as to issues actually litigated and as to those which could have or should have been raised in the previous litigation."  *Anne Arundel Cnty. Bd. of Educ. v. Norville*, 887 A.2d 1029, 1037 (Md. 2005).  The parties need not be identical, however, where the party in the earlier suit is in privity with the party in the present suit.  *See id.*

As discussed above, at the close of Plaintiff's state court action against J & J Logistics, the Circuit Court for Prince George's County entered judgment in favor of J & J Logistics.   Doc. No. 9 Ex. A, at 5–7.  The state court judgment therefore constitutes res judicata as to any further claims that Plaintiff could have made against J & J Logistics or those in privity with J & J Logistics, including its insurer Progressive Northern.  Because the only finding of liability in the state court action was against Mahdi and because J & J Logistics was held not liable for the accident, Progressive Northern is entitled to summary judgment unless Plaintiff establishes, as a matter of law, that Mahdi was an insured under Progressive Northern's Policy or the attached MCS-90 endorsement.[3]

1.    The Progressive Northern Policy

Interpretation and construction of Progressive Northern's Policy is governed by Maryland law.  *See, e.g.*, *Clendenin Bros., Inc. v. U.S. Fire Ins. Co.*, 889 A.2d 387 (Md. 2006).  In

---

[3] In his Opposition to Defendants' Motion, Plaintiff devotes one short paragraph to arguing that res judicata does not apply.  He claims that this case does not involve the same parties or the same issues.  However, for the reasons stated herein, identical parties need not be involved as long as the parties in the subsequent suit are in privity with those in the prior suit.  Furthermore, to the extent Plaintiff argues that Progressive Northern is liable based on J & J Logistics' liability, such a claim is barred by res judicata because claims as to J & J Logistics' liability were or should have been adjudicated in the state court action.  Even Plaintiff seems to acknowledge the preclusive effect of the state court judgment when he says, "[i]n this case, the Court must determine the very different question of whether there is coverage for the judgment Plaintiff obtained in the state court action."  Doc. No. 14 at 4.

insurance contracts, Maryland courts "look first to the contract language employed by the parties to determine the scope and limitations of the insurance coverage." *Id.* at 393 (citations omitted). If the analysis of the contract shows that the terms used are plain and unambiguous, the court must "determine the meaning of the terms of the contract as a matter of law." *Id.* (citations omitted).  As discussed above, *supra* Part I.A, it is undisputed that neither Mahdi nor his tractor were covered under the plain and unambiguous terms of the Progressive Northern Policy.[4]  *See* Doc. No. 9 Ex. B, at PL60–62, PL87–89.  Accordingly, Plaintiff's opposition to Defendants' Motion for Summary Judgment depends on the Court's interpretation of the attached MCS-90 endorsement.

2.    The MCS-90 Endorsement

Congress enacted the Motor Carrier Act of 1980 (MCA), "in part, to address abuses that had arisen in the interstate trucking industry which threatened public safety, including the use by motor carriers of leased or borrowed vehicles to avoid financial responsibility for accidents that occurred while goods were being transported in interstate commerce." *Canal Ins. Co. v. Distrib. Servs., Inc.*, 320 F.3d 488, 489 (4th Cir. 2003).  In furtherance of this purpose, the MCA requires all motor carriers registered to engage in interstate commerce to file "a bond, insurance policy, or other type of security" in an amount determined by the Secretary of Transportation and the laws of the State of States in which the carrier intends to operate.  49 U.S.C. § 13906(a)(1).  Pursuant to his authority under the MCA, *see id.* § 13906(f), the Secretary has issued regulations requiring that every liability insurance policy covering a motor carrier contain an MCS-90 endorsement.  49 C.F.R. §§ 387.7, 387.9, 387.15.  For purposes of the MCS-90 endorsement, "motor carrier" is defined as follows:

---

[4] Plaintiff acknowledges that his "only possible way of being made whole is through coverage under the MCS-90 endorsement."  Doc. No. 14 at 6.

> Motor carrier means a for-hire motor carrier or a private motor carrier. The term includes, but is not limited to, a motor carrier's agent, officer, or representative; an employee responsible for hiring, supervising, training, assigning, or dispatching a driver; or an employee concerned with the installation, inspection, and maintenance of motor vehicle equipment and/or accessories.

49 C.F.R. § 387.5. "Insured and principal" is defined in the same regulation as "the motor carrier named in the policy of insurance, surety bond, endorsement, or notice of cancellation, and also the fiduciary of such motor carrier." *Id.*

"It is well established that the primary purpose of the MCS-90 endorsement is to assure that injured members of the public are able to obtain judgment from negligent authorized interstate carriers." *Canal Ins. Co.*, 320 F.3d at 490 (quoting *John Deere Ins. Co. v. Nueva*, 229 F.3d 853, 857 (9th Cir. 2000)) (alterations omitted). "Accordingly, the MCS-90 endorsement creates a suretyship by the insurer to protect the public when the insurance policy to which the MCS-90 endorsement is attached otherwise provides no coverage to the insured." *Canal Ins. Co.*, 320 F.3d at 490 (citations omitted). The parties appear to agree that interpretation of the MCS-90 endorsement—a creature of federal statute and regulations—is governed by federal law. *See Armstrong v. U.S. Fire Ins. Co.*, 606 F. Supp. 2d 794, 820 (E.D. Tenn. 2009) ("[V]irtually all jurisdictions to consider the question have concluded that the interpretation of the MCS-90 is a matter of federal law.").

It is undisputed that the Progressive Northern Policy contained the federally mandated MCS-90 endorsement which provided primary coverage in the amount of $750,000.00 per accident. Doc. No. 9 Ex. B, at PL81. The MCS-90 endorsement was issued to J & J Logistics and included the following pertinent language:

> The insurance policy to which this endorsement is attached provides automobile liability insurance and is amended to assure compliance by the insured, within the limits stated herein, as a motor carrier of property, with Sections 29 and 30 of the

Motor Carrier Act of 1980 and the rules and regulations of the Federal Highway Administration (FHWA) and the Interstate Commerce Commission (ICC).

In consideration of the premium stated in the policy to which this endorsement is attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere.  Such insurance as is afforded, for public liability, does not apply to injury to or death of the insured's employees while engaged in the course of employment, or property transported by the insured, designated as cargo.  It is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, shall relieve the company from liability or from the payment of any final judgment, within the limits of liability herein described, irrespective of the financial condition, insolvency or bankruptcy of the insured.  However, all terms, conditions, and limitations in the policy to which the endorsement is attached shall remain in full force and effect as binding between the insured and the company.  The insured agrees to reimburse the company for any payments made by the company on account of any accident, claim, or suit involving a breach of the terms of the policy, and for any payment that the company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement.

*Id.*[5]

The parties dispute the meaning of the term "insured" in the MCS-90 endorsement.  If the term "insured" includes Mahdi, Plaintiff may be able to recover pursuant to the MCS-90.  Based on a reading of the pertinent legal authorities, however, the Court concludes that the term "insured" in the MCS-90 endorsement is limited to the insured named in the Progressive Northern Policy and attached endorsement—J & J Logistics—and Progressive Northern is therefore entitled to judgment as a matter of law.

On October 5, 2005, the Federal Motor Carrier Safety Administration (FMCSA) of the Department of Transportation issued a Regulatory Guidance that answered the precise question

---

[5] The endorsement attached to Progressive Northern's Policy tracks the language from the Illustration provided in federal regulations.  *See* 49 C.F.R. § 387.15, Illus. 1.

before the Court (hereinafter the FMCSA Guidance).  *Regulatory Guidance for Forms Used to Establish Minimum Levels of Financial Responsibility of Motor Carriers*, 49 C.F.R. Part 387, 70 F.R. 58065-01, 2005 WL 2438280 (Oct. 5, 2005).  The basis for the notice was a response to a petition for rulemaking to clarify the meaning of the term "insured" in Form MCS-90.  *Id.* Although the agency did not engaged in formal rulemaking, it provided the following guidance:

> Question: Does the term "insured," as used on Form MCS-90, Endorsement for Motor Carrier Policies of Insurance for Public Liability, or "Principal," as used on Form MCS-82, Motor Carrier Liability Surety Bond, mean the motor carrier named in the endorsement or surety bond?

> Guidance: Yes. Under 49 CFR 387.5, "insured and principal" is defined as "the motor carrier named in the policy of insurance, surety bond, endorsement, or notice of cancellation, and also the fiduciary of such motor carrier." *Form MCS-90 and Form MCS-82 are not intended, and do not purport, to require a motor carrier's insurer or surety to satisfy a judgment against any party other than the carrier named in the endorsement or surety bond or its fiduciary.*

*Id.* (emphasis added).  Following the issuance of the FMCSA Guidance, federal courts have been virtually unanimous in holding that the MCS-90 endorsement provides coverage only to the named insured.  *See, e.g.*, *Ooida Risk Retention Grp., Inc. v. Williams*, 579 F.3d 469, 477–78 (5th Cir. 2009); *Ill. Nat'l Ins. Co. v. Temian*, 779 F. Supp. 2d 921, 927–28 (N.D. Ind. 2011); *Great W. Cas. Co. v. Gen. Cas. Co. of Wis.*, 734 F. Supp. 2d 718, 737 (D. Minn. 2010); *Lancer Ins. Co. v. Hitts*, No. 5:09-CV-302 (CAR), 2010 WL 5351842, at *6–7 (N.D. Ga. Dec. 21, 2010); *Sentry Select Ins. Co. v. Thompson*, 665 F. Supp. 2d 561, 566–69 (E.D. Va. 2009); *Armstrong v. U.S. Fire Ins. Co.*, 606 F. Supp. 2d 794, 823–26 (E.D. Tenn. 2009).[6]

Plaintiff argues that the Court should reject the FMCSA Guidance because the agency's interpretation is inconsistent with the language and policy of the regulations surrounding the

---

[6] Even before the FMCSA issued its October 5, 2005 Guidance, it appears that a majority of courts held that the term "insured" as used in the MCS-90 and its predecessors applied only to the motor carrier named in the endorsement. *See, e.g.*, *Wellman v. Liberty Mut. Ins. Co.*, 496 F.2d 131, 138–39 (8th Cir. 1974); *Nat'l Mut. Ins. Co. of D.C. v. Liberty Mut. Ins. Co.*, 196 F.2d 597, 599–600 (D.C. Cir. 1952); *Del Real v. U.S. Fire Ins. Crum & Forster*, 64 F. Supp. 2d 958, 964 (E.D. Cal. 2009), *aff'd* 188 F.3d 512 (9th Cir. 1999).

MCS-90 endorsement.  The Court disagrees, as the regulations clearly and unequivocally provide

that the "insured" in the MCS-90 endorsement is "the motor carrier *named* in the policy of

insurance, surety bond, endorsement, or notice of cancellation . . . ."  49 C.F.R. § 387.5

(emphasis added); *see also Ooida*, 579 F.3d at 477 (noting that "insured" is "clearly define[d]"

by § 387.5); *Thompson*, 665 F. Supp. 2d at 567 (calling the definition unambiguous).  The Court

finds the FMCSA Guidance persuasive, and the agency's interpretation of its regulations is

"entitled to respect."  *See id.* at 567 n.6 (quoting *Christensen v. Harris Cnty.*, 529 U.S. 576, 587

(2000)).

Although the Fourth Circuit has not addressed this question, a recent decision from the

United States District Court for the Eastern District of Virginia further persuades the Court that

the MCS-90 endorsement applies only to named insureds.  In *Sentry Select Insurance Company

v. Thompson*, defendant Thompson had been involved in an accident with a tractor-trailer driven

by Eugene Brown.  665 F. Supp. 2d 561, 562–63 (E.D. Va. 2009).  The tractor Brown was

driving was owned by Eagle Valley Trucking, while the attached trailer was owned by Milligan.

*Id.*  Plaintiff Sentry Select Insurance Company had issued Milligan an insurance policy which

did not cover the tractor or trailer involved in the accident.  *Id.* at 563.  The Sentry Policy also

contained an MCS-90 endorsement.  *Id.*  Following the accident, Thompson obtained a judgment

against Brown and Eagle Valley in the Circuit Court for Loudoun County, Virginia.  *Id.* at 564.

The tractor's insurance company paid Thompson part of the judgment, and Thompson demanded

that Sentry pay the unpaid balance.  *Id.*  Sentry brought suit in the Eastern District of Virginia

seeking a declaratory judgment that it was not required to pay any part of the state court

judgment against Brown and Eagle Valley.  *Id.* at 563.  The *Thompson* court stated that the

dispositive question was "whether the MCS-90 requires coverage for the unpaid portion of the

judgment against Brown or Eagle Valley or whether the MCS-90 limits Sentry's obligation to pay Thompson [] only judgments against the named insured (Milligan)." *Id.* at 565.

The *Thompson* court granted Sentry's motion for summary judgment. First, the court relied on the MCA itself, which requires that the motor carrier's insurance "be sufficient to pay . . . for each final judgment against the registrant." *Id.* at 567 (quoting 49 U.S.C. § 13906(a)(1)). Accordingly, the *Thompson* court found that the purpose of the statute was to ensure payment for a judgment "against the registered motor carrier." *Id.* Second, as noted above, the *Thompson* court found that the definition of "insured" in the regulations unambiguously limited coverage to the named insureds. *Id.* at 567–68 (quoting 49 C.F.R. § 387.5). Third, the *Thompson* court found significant that the regulations do not require proof of insurance, but rather require proof of financial responsibility through one of three options—an insurer-issued MCS-90 endorsement, a surety bond, or an order from the FMCSA permitting self-insurance:

> Milligan could therefore have satisfied his statutory financial responsibility requirements through a surety bond or, with permission, as a self-insured. Had Milligan fulfilled his obligation in one of those ways, there would be no question that the Sentry policy terms would be inapplicable. Indeed, the Sentry policy would be totally irrelevant. Here, because the MCS-90 was promulgated for precisely the same purpose as a surety bond or self-insurance, it would make no sense to reach a different result based on how Milligan chose to discharge his federally mandated financial responsibility duties.

*Id.* at 568 (citing 49 C.F.R. § 387.7(d)). Ultimately, the *Thompson* court held that "in light of the unambiguous regulations defining 'insured,'" and its broader statutory and regulatory context, the MCS-90 requires payment for a judgment against the named insured only." *Id.* at 569.

Plaintiff does not address *Thompson* or other cases adopting the majority position but instead relies on two cases from the Ninth and Tenth Circuits to support his position that Mahdi was an "insured" under the MCS-90 endorsement. *See John Deere Co. v. Nueva*, 229 F.3d 853 (9th Cir. 2000); *Adams v. Royal Indem. Co.*, 99 F.3d 964 (10th Cir. 1996). Plaintiff argues that

the approach adopted by the *Nueva* and *Adams* courts is consistent with the fundamental purposes of the MCA and its implementing regulations.  However, the Court agrees with the *Thompson* court that neither case "acknowledges the statutory or regulatory framework promulgating the MCS-90 or explains how the term 'insured' in the MCS-90 is broader than what is defined in the governing regulations."  665 F. Supp. 2d at 569; *see also Armstrong*, 606 F. Supp. 2d at 824 ("It also appears to this Court . . . that the Ninth and Tenth Circuits . . . may have reached the wrong conclusion when the MCS-90 is viewed in the context of the statutory and regulatory provisions.").

Finally, Plaintiff maintains that this is precisely the type of case the MCS-90 endorsement was intended to cover, as J & J Logistics hired Mahdi and his truck but failed to insure either. Plaintiff also emphasizes that it was judicially determined in the prior federal court action that Mahdi was operating the vehicle in furtherance of J & J Logistics' commercial interests.  *See Forkwar v. Empire Fire & Marine Ins. Co.*, No. 09-cv-01543-WGC, 2010 WL 3733930, at *20 (D. Md. Sept. 20, 2010).  Although the factual conclusions reached in the prior state court and federal court actions may diverge, there are no disputed material facts before this Court.  The state court judgment shields J & J Logistics from liability to Plaintiff, and Progressive Northern is not otherwise liable for Plaintiff's judgment against Mahdi under the Policy or attached MCS-90 endorsement.  Accordingly, Progressive Northern is entitled to summary judgment.

The Court will also grant summary judgment in favor of Defendant Progressive Classic Insurance Company.  Defendants assert that Progressive Classic was not providing any coverage to J & J Logistics on the date of the accident, and Plaintiff has not argued otherwise or presented evidence that would support Progressive Classic's liability in this case.

**IV.      CONCLUSION**

For the foregoing reasons, the Court will DENY Plaintiff's Motion to Stay and GRANT

Defendants' Motion for Summary Judgment.  A separate Order will follow.

___December 14, 2012___                                    _____/s/_____
            Date                                                    Alexander Williams, Jr.
                                                                    UNITED STATES DISTRICT JUDGE